# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
team_g907@icloud.com THAT IS STORED
AT PREMISES CONTROLLED BY APPLE,
INC

Case No. 3:19-mj-00447-MMS



OCT 0 7 2019

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Ryan W. Borgeson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§
2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose
to the government records and other information, including the contents of communications,
associated with Apple ID team_g907@icloud.com (hereinafter the "SUBJECT ACCOUNT")
that is stored at premises owned, maintained, controlled, or operated by Apple, a company
headquartered at 1 Infinite Loop, Cuptertino, California. The information to be disclosed by
Apple and searched by the government is described in the following paragraphs and in
Attachments A and B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives
(ATF). Beginning in May 2018, I attended a 28-week ATF academy in Glynco, Georgia that
certified me as an ATF Special Agent. I have been assigned to the Anchorage Field Office since
December 2018. Since becoming a Special Agent with the ATF, I have participated in numerous

federal, state and local investigations involving firearm traffickers, armed narcotic traffickers, felons in possession of firearms and ammunition and the use of firearms in furtherance of drug trafficking crimes and other crimes of violence. Additionally I have a Bachelor's Degree in Criminal Justice from Sam Houston State University.

3. Through instruction and participation in firearm and narcotic related investigations, and through my conversations with other law enforcement officers, with whom I work, I know that:

a) The distribution of controlled substances is an activity that continues over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. I have learned through the experience of other law enforcement officers, that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. I have learned through the experience of other law enforcement officers, drug traffickers often have records of customers, as well as evidence of suppliers and co-

Page **2** of **28**

OCT 07 2019

conspirators, in one or more cellular telephones, either in the contact lists, sent or received calls, or text messages. These items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

OCT 07 2019

b) In *United States v. Terry*, F.2d 272 (9th Cir. 1990), *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th Cir.1986), *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in *United States v. Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c) Individuals involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly take measures insulate/distances themselves from their illicit activities, as well as the instruments used therein, to include premises, vehicles, firearms, and telephones. These measures include the use of real or

Page **3** of **28**

fictitious nominees for transactions and activities which require the presentation of identification. Examples of these measures include: the use of premises rented, owned, or maintained by others (to include the use of others in opening utility accounts); the use of cellular telephones held in another's name; the use of others to ship and/or receive money and/or controlled substances; the use of others to purchase and/or store firearms, and the use of others to directly interact with the drug customers during the transactions. These measures also include the use of vehicles rented or owned by others, as well as the failure to transfer the title to newly purchased vehicles from the previous owner to the trafficker or even a nominee.



OCT 07 2019

d) It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I have learned through the experience of other law enforcement officers that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution

Page **4** of **28**

activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

e) It is common for members of drug trafficking organizations to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f) It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the

Page **5** of **28**

OCT 07 2019

surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.



g) It is common for members of drug trafficking organizations to maintain telephonic communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory, iCloud account, or Facebook account.

h) It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name, but could be linked to the same iCloud account. A different subscriber name and/or telephone number is often used by members of a drug trafficking organization to thwart law enforcement detection of their illicit drug trafficking activities. These different telephone numbers often have different subscriber names and/or are pre-paid cellular

Page **6** of **28**

telephones where the subscriber is difficult to determine. Due to the fact that several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text messaging history or within the contacts section of the cellular telephone and could be stored in the iCloud account.

i)  It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained on the iCloud account.

j)  Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

4.  Further, through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner in which armed narcotics traffickers conduct their illegal business and the methods used to disguise their narcotics activities. From experience and training, I have also

OCT 07 2019

learned that narcotics traffickers frequently use encrypted cellular telephone applications,
cellular phone services, and other technologies to communicate, conduct, and conceal their
illegal activities from law enforcement.

5. Based on the facts as set forth in this affidavit, there is probable cause to believe that the
information described in Attachment A contains evidence of violations of Title 21 U.S.C.
§841(a)(1) possession of a controlled substance with intent to distribute and 18 U.S.C. §924(c)
possessing a firearm in furtherance of drug trafficking, as described in Attachment B.

OCT 07 2019



## PROBABLE CAUSE

### APD Case 18-10269

#### *March 11, 2018, Misconduct Involving Controlled Substance (MICS)*

6. March 11, 2018, Anchorage Police Department (APD) Officer Degnan was dispatched to
a disturbance at 7558 Foxridge Way #6F, Anchorage, AK 99518. PANGILINAN was arrested
on Municipal Conditions. During the search Officer Degnan found a small clear baggie with 1.15
grams of a white crystal substance in PANGILINAN's pocket. The substance field-tested
positive for methamphetamine. PANGILINAN stated during a post-Miranda interview that the
substance was methamphetamine and that he recently started using again.

### APD Case 18-51612 and 18-51793

#### *December 26, 2018, Eluding and MICS*

7. December 26, 2018, APD was pursuing a lead of a tracked stolen Subaru Outback
bearing AK Plate: JKN560. The vehicle was located at 8101 Peck, Anchorage, Alaska, still

Page **8** of **28**

running, and the driver sleeping in the driver seat, as the sole occupant. APD removed the driver (identified as PANGILINAN) from the vehicle without incident. Officer Rydberg observed two cell phones (**APD Tags: 1177969 and 1177970**) in the vehicle, one of which was receiving a text message.

8. According to Officer Rydberg, the message displayed on the phone was consistent with an illicit drug customer requesting $250 worth of an illicit substance from their drug supplier. Officer Rydberg based this opinion on his training and experience, as well as his tenure with APD's Vice Unit. PANGILINAN was searched and a small baggy with a white crystalline substance was removed from his left jacket pocket. The crystalline substance weighed 1.01 grams and field-tested positive for methamphetamine.

**APD Case 19-5404**

*February 10, 2019, Misconduct Involving Controlled Substance (MICS)*

9. February 10, 2019, APD Officer See conducted a traffic stop on a vehicle whose occupant(s) gave information to Officer See. Officer See was informed that PANGILINAN had multiple warrants and was dealing narcotics. PANGILINAN was currently supplying "Isaac" who works security at Barrett Inn Hotel (Address: 4610 Spenard Rd, Anchorage, AK 99517).

**APD Case 19-7231**

*February 24, 2019, MICS, Assault, Eluding, Resisting Arrest, Tampering with evidence*

10. February 24, 2019, APD responded to a shots fired call at the Mt. View Car Wash (Address: 3433 Commercial Dr, Anchorage, Alaska). When officers arrived a green/black Honda

Page **9** of **28**

Civic bearing AK Plate: JKX415 was attempting to flee the location. Officer Frey attempted to block the Civic which resulted in the Civic ramming the patrol car. The driver of the vehicle (identified as PANGLILNAN) fled the vehicle along with passengers Hans WELLS and Shania AGLI. A pistol was observed on the driver's seat of the vehicle with an extended magazine.

11. PANGILINAN pulled an iPhone (**APD Tag: 1181490**) and other items out of his pockets, dropping them on the ground. PANGILINAN continued to refuse commands and was ultimately tased to gain compliance. Officers located a baggy containing .81 grams of a white crystal substance that tested positive for methamphetamine near the iPhone, where PANGILINAN was dropping items on the ground.

12. During a post-Miranda interview, AGLI stated that she received a phone call from PANGILINAN where she heard gunshots in the background. AGLI arrived at the Mt. View Car Wash and observed PANGILINAN upset and he shot a round into the center console of the vehicle. While speaking with PANGILINAN, AGLI heard sirens in the distance. PANGILINAN then attempted to take another vehicle, trying to flee the scene.



### APD Case 19-19061

#### *May 31, 2019, Assault on Peace Officer*

13. May 31, 2019, APD Officer Richwine performed a traffic stop on a black GMC Yukon/Denali bearing AK Plate: EAA659 at the 227 block of Newell Street, Anchorage, AK. As Officer Richwine contacted the driver of the vehicle, Officer Richwine observed spent cartridge cases on the front and rear passenger floorboards, numerous loose pieces of ammunition

throughout the vehicle, along with a loaded Glock 21 pistol with an extended magazine tucked behind the driver seat near the center console. Officer Richwine secured the Glock 21 pistol and began asking the driver and passenger questions. The driver of the vehicle was identified as PANGILINAN.

14. While Officer Richwine began to research PANGILINAN through his mobile computer in his patrol vehicle, a white Kia sedan or white Ford Fusion with tinted windows drove by the traffic stop, shooting. Officer Richwine began to exit his vehicle, and as he was doing so, the GMC Yukon/Denali bearing AK Plate: EAA659 began to drive in reverse toward Officer Richwine's patrol car. The GMC Yukon/Denali rammed the patrol car and the open driver door struck Officer Richwine in the chest, knocking him off his feet, and causing him pain. The GMC Yukon/Denali pulled forward and backed into the patrol car again to gain space, attempting to flee. The GMC Yukon/Denali eluded police, driving through fences and yards. The GMC Yukon/Denali and white Kia/Ford Fusion successfully elude apprehension.



**APD Case 19-19615**

*June 4, 2019, Threat*

15. June, 4, 2019, APD Officer Timothy Masten was investigating a drive by shooting threat at 1037 Fred Circle, Anchorage, AK 99515. Officer Masten interviewed the neighbors of 1037 Fred Circle who confirmed that two previous shooting occurred at 1037 Fred Circle on June 3, 2019 and June 4, 2019 (APD Reports 19-19404 and 19-19552). Officer Masten interviewed the

Page **11** of **28**

occupant/victim of 1037 Fred Circle who stated that she received a text message from her husband naming PANGILINAN as one of the four suspects of the reported shootings.

16. Officer Masten contacted the Anchorage Pretrial Office and was informed that PANGILINAN was a methamphetamine dealer. PANGILINAN had cut off his ankle monitor on May 20, 2019 and pretrial retrieved the property on May 21, 2019 and found a meth pipe along with an empty holster were located at PANGILINAN's residence 327 Pauline St #B, Anchorage, AK 99504.

OCT 07 2019



## APD Case 19-19902

### *June 6, 2019, Eluding, MIW/Driveby Shooting*

17. June 6, 2019, APD was actively looking for a 2001 black GMC Yukon/Denali bearing AK Plate: EAA659 for being in multiple crimes. The GMC Yukon/Denali was located at 3021 Lois Drive, Anchorage, Alaska unoccupied. A gold GMC Sierra bearing AK Plate: JDA631 dropped off a Polynesian male who got into the driver's seat of the black GMC Yukon/Denali. Officer Lewis attempted to stop the GMC Yukon/Denali. The driver failed to stop and Officer Lewis unsuccessfully attempted to pin the GMC Yukon/Denali. An occupant of the gold GMC Sierra began firing multiple rounds while Officer Lewis attempted to stop the GMC Yukon/Denali.

18. The GMC Yukon/Denali was located near 833 N Bunn, Anchorage, Alaska, and the GMC Sierra was located at 3324 Thompson, Anchorage, Alaska, both vehicles unoccupied. The vehicles were seized pending search warrant and taken to APD Indoor Secured Storage.

Page **12** of **28**

19. June 11, 2019, APD applied for and was granted search warrants 19-1898SW (gold GMC Sierra bearing AK Plate: JDA631) and 19-1900SW (black GMC Yukon/Denali bearing AK Plate: EAA659).

20. June 12, 2019, APD served search warrants 19-1898SW and 19-1900SW. Fingerprints and DNA were taken from both vehicles. June 18, 2019, the fingerprint specimen from the gold GMC Sierra's driver's exterior door was positively identified as belonging to PANGILINAN.

21. During the course of this investigation, I have learned that PANGILINAN and his co-conspirators travel in tandem vehicles. If one of the vehicles is stopped by law enforcement, the other vehicle will provide a distraction, such as shooting in the officer's direction, so the other vehicle can elude law enforcement.



### APD Case 19-24229

### *July 9, 2019, MICS and Eluding*

22. On July 9, 2019, APD conducted surveillance at 327 Pauline, Anchorage, Alaska for an active State of Alaska arrest warrant for PANGILINAN. PANGILINAN left 327 Pauline and got into the right rear passenger seat of a red Suburban bearing AK Plate: EEJ941. The driver of the vehicle was observed and identified as Hans WELLS. WELLS also had outstanding warrants for his arrest. APD followed the red suburban to the Holiday Gas Station at 1405 Bragaw, Anchorage, Alaska where they attempted to stop the vehicle. The Suburban eluded.

23. APD officers located the red Suburban, abandoned, in an empty parking lot at the intersection of Fireweed Lane and Seward Highway, Anchorage, Alaska. APD officers observed

PANGILINAN enter 606 E Fireweed Lane, Anchorage, Alaska at approximately 1745 hours, via Sorrento's Restaurant (Address: 610 E Fireweed Lane, Anchorage, Alaska) surveillance camera footage. At approximately 1901 hours, PANGILINAN departed 606 E Fireweed Lane and got into an unknown white Chevrolet Tahoe.

24. At approximately 2215 hours, PANGILINAN was observed leaving 3240 Penland Parkway #88, Anchorage, Alaska in the front passenger seat of a red Honda CRV, bearing AK Plate: JMM930. APD officers observed WELLS leave 3240 Penland Parkway #88 and walk east towards Burger King (Address: 700 Northway Dr, Anchorage, Alaska). Officers observe WELLS approach a 2014 white Cadillac Escalade (AK Temporary Tag: T816535) where PANGILINAN was standing near the driver's side door.

25. At approximately 2225 hours, APD officers approached the vehicle to arrest PANGILINAN. PANGILINAN attempted to flee the area. APD Officer Jonathan Butler observed PANGILINAN discard items as he fled the area. PANGILINAN climbed a fence on the west side of the Burger King parking lot and continued to discard items, to include a white iPhone with a Under Armour case and sim card (**APD Property Tag: 1198846**). APD officers eventually contacted PANGILIAN and he was arrested for his outstanding State of Alaska arrest warrant.

26. Through his prior training and experience, APD Officer Butler identified some of the discarded items as suspected methamphetamine. APD Officer Sean Keating collected and took custody of the suspected methamphetamine and the white iPhone. The substance field-tested positive for methamphetamine. The methamphetamine was weighed at APD and had a gross

OCT 07 2019

weight of 166 grams (including packaging). Additionally, officers observed and captured a photo

of the locked screen of the white iPhone in which there were several missed calls and Facebook

messages from known associates of PANGILINAN.





OCT 07 2019

27. APD applied for and was granted search warrant 3AN-19-2225SW for the detached storage shed in the back yard of 327 Pauline #B, which PANGILINAN had sole access to. Officers observed a sophisticated security system within the shed which covered all avenues of approach along with a safe, firearm magazines, ammunition, a digital scale, and other items. The following items were seized from the shed:

    a) **APD Tag: 1198643**-Swann DVR

    b) **APD Tag: 1198644**-Samsung DVR

    c) **APD Tag: 1198645**-Night Owl DVR

    d) **APD Tag: 1198647**-Digital scale

    e) **APD Tag: 1199219**-Safe

28. APD Officer Butler breached the safe and seized the following content within the safe:

    a) **APD Tag: 1198641**-Drug scale from safe, with drug residue

    b) **APD Tag: 1198642**-Two Thumb Drives from safe

29. On July 10, 2019 (the day after PANGILIAN was arrested after fleeing officers), ATF Task Force Officer (TFO) Adair contacted occupants at 3240 Penland #88, Anchorage, AK where PANGILIAN was observed the previous day. Veronica ZITTNAN was arrested for outstanding warrants after she attempted to flee the residence. ATF TFO Adair spoke with occupants of the residence, who stated PANGILIAN discarded multiple firearms at the home after initially fleeing officers on the 9th. ATF TFO Adair suspected evidence of this information might be contained within the cellular telephone PANGILIAN attempted to discard before being arrested.

**ATF Case 787010-19-0069**

*Continued investigation*

30. Based upon my training and experience, the amount of methamphetamine possessed by PANGILIAN on July 9, 2019 is consistent with the intent to distribute. Although no firearms were located on his person at the time of arrest, it is common for individuals engaged in mid-level drug transactions to possess firearms to protect themselves and their business endeavor. This common possession of firearms is also apparent in the aforementioned cases. I suspect evidence of his involvement with firearms, in relation to the distribution of controlled substances, will also be located within the team_g907@icloud.com iCloud account sought in this affidavit.

31. August 7, 2019, at approximately 1330 hours, APD Cyber Crimes Technician Brandon Hunter executed search warrant 3:19-mj-291-DMS for PANGILINAN's phone (**APD Tag: 1198846**). The security encryption could not be bypassed. From the partial extraction, ATF SA Ryan Borgeson was able to locate an iCloud account linked to the phone: team_g907@icloud.com.

32. On October 2, 2019, ATF SA Borgeson reviewed jail phone calls made by PANGILINAN, July 10, 2019 through August 1, 2019 and September , while incarcerated in Anchorage Jail (Address: 1400 E 4th Ave, Anchorage, Alaska). A review of these jail calls identified the following pertinent conversations made from PANGILINAN's account:

*July 22, 2019 at 1632 Hours - Phone call to phone number 907-957-0944*

a) At approximately 4 minutes and 55 seconds Shania asks PANGILINAN "Why you keep telling me you fucked over my cousin Mathew nigga?" "Why do you keep telling me you got my cousin for 800?". PANGILINAN replies with "cause he didn't send my fucking last bill, he owe me like 1800 the last trip".

b) At approximately 8 minutes Shania states "I know I should have got you for that ah eight (8) grand last time" "the eight, eight, eight racks last time". PANGILINAN responds with "oh oh ya in the bag?". Shania responds with "eight grand in fifteen minutes nigga".



c) At approximately 10 minutes and 10 seconds PANGILINAN states "he admitted to Anchorage Police that he drives me around town to sell drugs" "I don't know but, I forgive him".

d) At approximately 14 minutes Shania asks PANGILINAN if he ever found anything out about his Kia. Shania wonders if APD still has it and what is going on with it, referencing that something of significance was located in the vehicle.

e) During the course of the investigation, I have learned that PANGILINAN and his co-conspirators have engaged in numerous crimes involving firearms and controlled substances. I suspect evidence of his involvement with firearms, in relation to the distribution of controlled substances, will be located within the Kia.

*July 23, 2019 at 2013 Hours - Phone call to phone number 907-957-0944*

Page **18** of **28**

f)  At approximately 4 minutes into the conversation, PANGILINAN states "Tell
    Mika I'm over here ah, I'm on Golf Mod" "the side of the jail where the trailer is
    where he could just pishhh pishhh pishhh" If they know where I am at technically
    they could get me out of here" "cause the gate is right there, and its only grass"
    "only fucking a wall." "I think one Hummer." "I'm going to make a plan and send
    it to you".

*July 31, 2019 at 1651 Hours – Phone call to phone number 907-312-0386*

g)  At approximately 1 minute and 10 seconds into the conversation PANGILINAN
    states "I left something in there... the cabinet where the dart board is" "there's a
    gat there... my gun, just look you'll see it".

*September 26, 2019 at 2031 Hours – Phone call to phone number 907-744-8071*

h)  At approximately 15 minutes and 30 seconds PANGILINAN states "I'm going to
    do my time, I'm going to finish it... then I'm back at it again."

## INFORMATION REGARDING APPLE ID AND iCLOUD

33. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

35. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a) Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b) iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c) iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d) iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.

Page **20** of **28**

iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices. iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e) Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

f) Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g) App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.



36. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be

linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

37. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

38. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.


OCT 0 7 2019

Page **22** of **28**

39. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

40. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.



OCT 0 7 2019

Page **23** of **28**

41. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

42. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of methamphetamine trafficking, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

43. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant



OCT 0 7 2019

messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of narcotics and firearms trafficking, including to communicate and facilitate the sale of narcotics and firearms.

44. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

45. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store

Page **25** of **28**



OCT 0 7 2019

may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For instance, based on my experience investigating narcotics and firearms traffickers, I know that traffickers frequently communicate using the following applications, but not limited to, WhatsApp, Instagram, Telegram, Facebook Messenger etc. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

47. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

48. Based on the above examples, I therefore submit that information stored on Apples servers will show evidence of the crimes of conspiracy to distribute controlled substances and the use and carry of a firearm during and in relation to a drug trafficking crime. More specifically, and as previously stated, there is probable cause to support that the user information, IP addresses, photographs, text messages, and apps downloaded will show evidence that PANGILINAN distributes controlled substances and/or possesses firearms while distributing controlled substances.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED



OCT 0 7 2019

Page **26** of **28**

49. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **AUTHORIZATION REQUEST**

50. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

51. I further request that the Court direct APPLE to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control within seven (7) days. Because the warrant will be served on APPLE, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **CONCLUSION**

52. Based upon the foregoing, your affiant submits this affidavit as probable cause to believe Gian PANGILINAN is in violation of Title 21 U.S.C. §841(a)(1) possession of a controlled

Page **27** of **28**



OCT 0 7 2019

3:19-mj-00447-MMS

substance with intent to distribute and 18 U.S.C. §924(c) possessing a firearm in furtherance of drug trafficking and is requesting a search warrant be granted authorizing the examination of the icloud account team_g907@icloud.com.

53. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that — has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Ryan W. Borgeson
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me this 7th day of October, 2019

UNITED STATES MAGISTRATE JUDGE

MATTHEW M. SCOBLE
U.S. Magistrate Judge

Page **28** of **28**

Case 3:19-mj-00447-MMS   Document 1-1   Filed 10/07/19   Page 28 of 28